The first case is Farrar v. City of Binghamton. May it please the Court, Alex Walworth for the Plaintiff Appellant. Your Honor, it is contrary to the District Court's determination and to my adversary's argument, this case does not come down simply to one of credibility for the jury to determine. And the reason that is, is because Officer Miller testified that he mistook this, the Xbox controller, for this. It was dark. Your Honor, the daylight was already taking place and Officer Miller never argued it was too dark to see the difference between this and this. No matter how you hold this, in whatever configuration it might be, it's meant to be held for two hands with planks. It doesn't look like this. Mr. Farrar claims it wasn't even in his hands. That's correct, Your Honor. I'm putting aside the fact that Plaintiff denies he was even holding something like this in his hands, among other things. He denied also that the defense argued that Mr. Farrar must have held this when he went to sleep at 2 o'clock in the morning after he used this to watch a movie. It's for games and for watching movies because it's a console and that's what it does. Thank you. We know some of that. Okay. If you have grandchildren, of course. The children, of course, I know it as well. And this is an exact duplicate of what the jury saw and what Officer Miller claims he saw that was this. Why on earth would Mr. Farrar go to sleep at 2 o'clock in the morning and hold this in his hand all night long? You're taking the Plaintiff's testimony as the baseline. I'm taking— The jury doesn't have to accept the Plaintiff's testimony. Your Honor, I understand that, but— Miller didn't say that he saw the Plaintiff get up from lying down asleep and reach down the floor and pick up the Xbox controller. He said that he came in and he saw a person facing him, advancing towards him, holding something in his hand that he thought was a gun. Exactly so, Your Honor. It wasn't something in his hand that he thought was a gun. He said, I looked and I saw—I saw—I looked and I saw a small—he describes it exquisitely—a small, silver-gray, 38-snub-nose revolver, which this is pretty much what that is. This is a toy gun, painted silver-gray, to look exactly as he described it. There is—of course, credibility is an issue. Of course, Mr. Farrar had to—whether he was believed or not, it's impossible to say. I say that you can reasonably mistake this for this. What's the role of the jury? To determine the facts, Your Honor, and to determine the facts reasonably. And we submit, Your Honor, that it just simply is not believable. You're arguing to us that the jury could not reasonably conclude that a police officer coming in there, where they have tried unsuccessfully on a few efforts, on the first effort to bash down the door, and now they have given notice to the persons in the apartment who they know to be armed and dangerous. Which Mr. Farrar was not. They know that there are occupants, supposedly, in there who are armed. That's why they're going in. It was a no-knock entry. And he sees somebody standing, facing him, according to his testimony, advancing towards him with an object in his hand, and you're saying he should—wait a minute, is that an Xbox controller or is it a gun? Your Honor, I can only repeat that it's not enough to say— You're welcome to spend your whole time repeating it. It's not enough to say that I saw this and I thought it was this. There's no comparison. Everyone testified that there's no resemblance. The jury, I assume, saw both of those. The jury saw photographs of this and they're in the record. They didn't see the gun? They saw photographs of 38 snub-nosed revolvers. But they didn't see these? They saw neither actual exhibit, neither actual object that you're holding. That's correct, Your Honor. That's correct. I don't think it makes a difference, Your Honor. I simply submit it makes no difference. It still has to be—this Rule 50 standard is strict, right? Complete absence of evidence. So you're essentially saying that Officer Mitchell's testimony was— Officer Miller's testimony was utterly incredible, that we're entitled to set it aside— It was either insufficient in law or the verdict was against the weight of the evidence based on the testimony. There's also the fact that, as I said before, that the officer never claimed it was too dark to see. He never said I shot in a panic. He never said that the stress of the situation caused me to think something that I didn't that otherwise was not the case. He simply said I looked and I saw and I thought it was this when it was actually this. And again, it beggars belief to believe that, as the defendants argued, that the plaintiff had to have had this in his hand all night. Why would he have this in his hand all night and then get up from the couch, as Your Honor says, approach the officer while he's being told to get down, holding his hands out, because that's what Officer Miller said, he held his hands out for some unknown reason, approaching him and not getting down. And then Officer Miller says I thought this was this and shoots him. Okay. That would suggest that the plaintiff was suicidal. Now, counsel, this went to the jury. What are we to do with the fact that the jury found the facts otherwise? Your Honor, the court can find that the jury's verdict is against the weight of the evidence. It's a miscarriage of justice. It's not as if you have to conclude, and we would like you to, but it's not as if you have to conclude that it was insufficient as a matter of law. If you think that that's not the case, we submit that at the very least there should be a new trial. I'd also point out that Officer Miller. You argued to the jury that Miller was lying? Excuse me? You argued to the jury that Miller was lying? I don't know if the word lying was actually used, but the argument to the jury was that Miller's testimony is not believable, that it's unreasonable. You can't reasonably mistake this for this. And then also, when the Hawley report was the investigation by Investigator Hawley, the next day, Officer Miller said not one word to explain why he thought to justify the shooting, which is strange in itself. And that's why we cited strongly, Your Honor, your Honor's Tegel case, where under very similar principles, not factual situation, but there was a negligent act that was not reported for the purpose of explaining why, in that case, the shipmates let go of a halyard that struck the plaintiff. Why did not Officer Miller explain to the investigator, well, you know, I thought this was this? They're not similar at all. They're not similar at all. But in the Tegel case, there was no evidence. There was no evidence put forth by the person who caused the harm to explain why he let go, why he lost control of the— And I suggest— In this case, you have evidence. In this case, you have Miller's testimony saying, I saw a man standing, coming towards me, holding something in his hand. I thought it was a gun. But the only reason that Miller can justify the shooting by saying that the plaintiff was approaching me is if he reasonably thought that what he was holding was a gun. And I submit that it's unreasonable, I say as a matter of law, but I think it's against the weight of the evidence to conclude that this resembles this, even in the heat of the moment. There was testimony. It was clear. It was undisputed that you can't simply enter the— Correct me if I'm misremembering the record, but as I understand it, your client gave an account that was different, not just—strikingly different. He says he's seated on the couch with his arms outstretched, nothing in his hands, and arms outstretched signifying surrender. Yes. So doesn't that suggest that if the jury believed your client's testimony, it would have found against Officer Miller. So it disbelieved your client's testimony and believed Miller's testimony that he mistook the gray object for a gun. And our argument is not—our argument is that the plaintiff was obviously truthful, but that you could not then go from—we don't believe a plaintiff because they found 10 percent contributory negligence, but you can't then jump to the conclusion that Miller must be telling the truth. Charpinski testified. There was a stack of officers. Officer Charpinski was right behind Miller, right behind—cheek by jowl, right behind him. He knows nothing about anything that Miller said happened. Miller says this all took place in two or three seconds. I came in with a gun like that in the stack after the door had been breached, and I shot. That's what Charpinski says, that he heard the shot immediately upon the breach, and that's what all the other officers in the stack heard. They heard the door being breached. It took a long time, but they heard the door being breached, meaning it was opened, and I shot immediately. The testimony by all concern was that shooting immediately upon opening the door, upon breaching on a no-knock warrant, is wrong. It's a wrongful shooting. It can't be justified. Charpinski says— If you break open the door and you come in, and Miller was the lead on the procession, and he was the one who came in, how long is he supposed to wait if he sees a person standing, facing him, holding something in his hand that he thinks is a gun? How long is he supposed to wait? He has to reasonably identify it's a gun. Well, is he supposed to say, would you please show that to me so I can verify? No, Your Honor, but he's trained to distinguish a toy, and this is not a toy gun. We're not talking about a toy gun versus a real gun. We're talking about a toy, a computer controller device that everyone concerned said looks nothing like a gun, mistaking it for a gun. Simply saying, I mistook it for a gun, and that's why I think this is a Tegel case. Simply saying, I mistook it for a gun, without saying why I mistook it for a gun. He never says why. He never tells Hawley. That's for sure in the report. He never says, I mistook it for a gun because they look like each other. They don't. He doesn't say that. Everyone—all the officers testified they don't look like each other. That's undisputed. If he had said this object, which looks like a gun, looked like a real gun, then we wouldn't be here. What he testified to is this thing. There's no way you can hold this to think that it resembles a very, very specific testimony, a small, gray, silver-gray .38 snub-nose revolver. Not that I saw an object that looked like a gun that was a different kind of gun. It was this versus this very specific thing, and we submit that you simply cannot make that determination reasonably, so that, therefore, I think, Your Honor, with all due respect, I think this is exactly like a Tegel case where the ship's hand dropped the object, and here there is similarly no explanation as to why Officer Miller thought that what was being held in and out by the plaintiff, who he denies holding anything, and why would he have, mistaking it for this again. He never said, too dark, stress. It was just, I looked, I saw, and I thought. It's like saying when you talk to your children, why did you do that? Well, because. Why? Why did you think it was a gun? Because. That's his answer, and I submit, Your Honor, that's not enough. Thank you. Thank you. We'll hear from co-counsel. May it please the Court. My name is Robert Janus. I'm the guy that tried the case. I have a question for you, counsel. Shoot. I'm reading from page 1548 of the record. Okay. And it's a meeting, it appears, with the court and you and, obviously, opposing counsel. And the judge says, I'm going to have to, it talks about excessive force, intentional negligence. And he said, so I'm going to have to carefully distinguish between those two situations. And the same thing, and the same thing with this. Still the city can be liable under respondeat superior because of what the shooter did, and, this is the phrase I want to call your attention, and it can be liable on its own connection with what the relationship was with the SWAT team. No, but he never gave that second theory of the city's liability, and as far as I could tell, you never objected to the absence of that charge. The charge given allowed the jury to find, as they did unanimously find, that the city of Binghamton was negligent. Only under the theory of respondeat superior. Not that they might have been liable because of what the SWAT team did or failed to do. He didn't charge that, unless he did and I missed it. I have a different recollection of the charge, Your Honor. My memory isn't, I could be wrong, is that he did, in fact, charge the jury with respect to negligence of the city of Binghamton. The jury verdict for him, though, used the phrase respondeat superior, right? So on the jury verdict, it wasn't given a box to check for negligence on the theory that the city had inadequately prepared for this incident. No, there were separate jury questions. Some of the jury questions specifically related to Miller and proximate cause. Some related specifically to the city of Binghamton. So the city of Binghamton violated good and accepted police practices procedures, which is why special duty is inapplicable to this case. The lower court erroneously ruled that special duty was applicable when the courts in the state of New York, and this is New York law, Lubecki, Rodriguez, and even Valdez. Surely. To make sure I'm understanding. Okay. Because you put on substantial evidence that went to the city's negligence on something other than a respondeat superior. Yes. Theory, all that stuff about you didn't bring the right battering ram, the Google, you didn't use goggles, flash bangs, the tactical mirrors. That would all be completely irrelevant if this were just on a respondeat superior theory. So you're saying that if we, when we look back at the record, we'll find the jury was instructed on the theory that the city was liable in negligence. That's my memory, Judge. But the verdict sheet only gave them the opportunity to find the city of Binghamton liable under the theory of respondeat superior. Is that correct? That's not my memory of the verdict sheet either. I could look at it again, as obviously the court can, but my memory is that the verdict sheet allowed for the jury to find negligence independently for the city of Binghamton, which is what they did based on their multiple violations of good and accepted police practices. I'm a little confused by this because one theory of negligence, one theory of liability was that the city is responsible because of Miller's misconduct in shooting the plaintiff. Another theory of liability of the city was the city is liable because of the the. I'm not sure whether it should be called negligence, but the fault of the team and and their supervisors, whoever was involved in failing to plan the raid properly in failing to do sufficient advance reconnoitering, getting a layout and so forth, using the lighter rather than the heavier battering ram. In either case, the city's liability would be premised on respondeat superior. It would be the city's responsibility for the failure to to act appropriately by the police officers, whether it's Miller making the shot under circumstances where he shouldn't have, or whether it's Miller and the rest of the group, including their supervisors, in failing to to plan the raid properly. You're quite right, and 1712 addresses your questions where it says, Clerk, is the city of Binghamton liable for negligence with respect to the incident on August 25, 2011, under a respondeat superior theory? This is after they had already discussed Miller, and the jury says yes. So yes, it was the respondeat superior for the other officers of the city of Binghamton. And the argument made by counsel was that the group doing the no-knock entry with the battering ram didn't plan it properly, violated appropriate police procedures, and so on. And I don't understand why respondeat superior isn't perfectly appropriate. I mean, there could be another theory. There could be a kind of a theory that the city didn't train its police officers properly, that the city didn't establish proper standards, but that wasn't what was being argued. Correct. What was being argued was that this instance of knocking down the door and making an entry wasn't properly planned, should have had the heavier battering ram, should have been planned better, et cetera, et cetera. Correct. There was no plan. There was no judgment. There was no plan. And that's what the jury found, and that was the charge. And the verdict sheet said respondeat superior against city of Binghamton. But my further question is, I failed to find evidence that supports that theory in the record. As I've looked at the record, the brief submitted to us does not contain any instances of reference to evidence that would show violation of accepted police procedures in what was done. I mean, there were questions like, if you don't plan, that would be bad, right? It could have bad consequences if you don't plan. Yes, right. That's true. Could have been better if you had done more of this or more of that. Yes, that's true. But there was no evidence. I mean, under New York's rules with respect to discretionary conduct, you had an obligation to show that the conduct violated accepted police procedures. And that was done here. The chief of police himself admitted, page 958-59, that there was a failure to provide sufficient and proper intelligence, including lay out in advance, and that was a violation of police standards. There were multiple admissions by the police chief and other officers. Let's have an exact. What testimony are you looking to? What page? Well, right now, the chief of police, 958-59. 958-59. And I think I have looked at exactly that. 958 and 959. And you're talking about at line 21? Line 21, is that right? That's one of the places, yes, your honor, where it talks. Yes. If a police department fails to provide sufficient and proper intelligence to the police officer to safely perform their duties, that's generally a violation of police rules of the road. True? Yes. He didn't say that this instance was a failure to provide sufficient and proper intelligence to safely perform the duties. He didn't say that. That's an abstract question about a proposition. There was no evidence in the case that this was a failure to provide sufficient information for the duties to be performed satisfactorily. I disagree, respectfully, your honor. Do you have anything else? Yes. Not only did he say it would violate, on the very next page, professional police standards of care, there were multiple places in the record where the chief conceded there was no intelligence gathering. There was no plan whatsoever. There was no building plan or layout obtained. There was no reconnaissance. There was no surveillance. They failed to bring the equipment that they were required to bring. So we have multiple statements by the police chief as well as other officers about what the standards of care required, and then we have the testimony that they failed to do so. If you'll be patient, give me your references to the testimony. Surely. Exact page and line. Hold on. We'll have to look at them. Okay. That, for example, with a plan. Just give us the page and line. Give us the pages and line. After that, you can argue about what they say. Surely. 450 and 332 to 333 is supposed to have . . . Wait, wait, wait, wait, wait, wait. Sorry. Slow down. Sorry, Judge. Page 450? Yes. All right. And it's supposed to have a plan. And then 332 to 333 . . . 332 to 333. . . . is . . . Why didn't you cite any of these things in your brief? I believe we did cite them in the brief, Your Honor. You did? They were cited in the brief as well as in the lower court submissions. When I made the motion . . . You're talking. I'm not . . . You want me to go looking in everything you cite in the lower court? No, Judge. No. But it was in the brief, Your Honor. 450, 332, 333 . . . Yes. Okay. That was with respect to having a plan. Then, for example, with intelligence, 954. You must obtain and use all available and reliable intelligence. And then 958 to . . . I'm sorry. We already covered 958 to 959. I meant to tell you to have that. You should always try to get the building plan . . . I'm sorry. 961 and 960 talk about the layout and the building plan. Yeah. Reconnaissance, critical to success, page 457.  Surveillance . . . It would be a good idea to put these in your brief if you rely on them. I thought they were all in the brief, Your Honor. That's where I got all my references when I was preparing for oral argument. I looked through the brief. Surveillance . . . Proper preparation is part of a pre-raid surveillance. 451 . . . 451 . . . And that clearly . . . And I could give the testimony where they say there was no surveillance. Failure to bring equipment. We have the different categories. Supposed to bring all equipment . . . You're talking faster than I'm here. Sorry. I'm sorry. What I want is page numbers. 977, 978, and then 470, 471 is about supposed to bring all equipment, and then including specialty equipment is 452 to prepare for various contingencies back to 471. And did the Chief admit that they didn't do these required things . . . Yes. . . . in this case? Yes. And the theory of liabilities responding at Superior . . . Yes. . . . is not a failure to train. Correct. Why not a failure to train? There was some proof of a failure to train that we did have an evidence. There was a prior training episode where they did say, you're not using the right equipment, you're not communicating, you're not doing it properly. My judgment as the trial lawyer was I did not feel that was strong enough. I felt this was far stronger to get out of the mouths of adverse parties admitting what the standards of care were and that they failed to comply with same. But is that really responding at Superior? That is responding at Superior because the municipality is responsible for the negligence of its employees. These are its employees. But they found Miller not negligent. That's the problem with . . . They found Miller not negligent for the shooting, but what the jury unanimously found is that, yes, the reason Miller shot is because of the heightened danger, because they did everything wrong. So they had no time, it took them almost a minute to get a wooden door open, 10 times with the battering ram. Miller said he was concerned with this. Miller said he was frightened. They conceded heightened danger. He shot the first thing he saw because of all of this. Their negligence was a substantial factor in causing Miller to shoot. That's what the jury unanimously found, and there was ample grounds for it in this record. So even though they found Miller not negligent, not negligent and not guilty of battery . . . Correct. They found the city of Binghamton . . . It's a separate theory. . . . negligent. It's a separate theory. The theory is that the shooting of the plaintiff by Miller was the result of inadequate planning and the bringing of an inadequate battering ram so that instead of getting a surprise entry with one blow, bang, and the door is down and everybody's asleep but now waking up, they gave warning to everybody, which made Miller frightened that he was facing armed resistance. Why didn't the judge agree with you that this theory carried the day? What was his problem with throwing out the verdict? At trial, the judge did agree with me. In the post-trial motion, he accepted the defendant's argument that special duty was applicable when I respectfully submit it is not. Special duty is not applicable when there is a violation of police practices and procedures. Do you have a case? Certainly. A few of them. The Lubecki case right off the bat and the Rodriguez case, both of which are cited in the record, but Lubecki is 304 Appellate Division 2nd, specifically 233 to 234. The Rodriguez is 189 82nd, specifically page 178. Some of those cases, do they predate Applewhite? They do predate Applewhite, but even Applewhite in the case. So explain to me why Applewhite doesn't abrogate them. I'm sympathetic to your argument that it doesn't, but I'm not quite understanding it. Applewhite, even in the concurring opinion by Judge Smith, he discusses how the special duty does not apply in police shooting cases, and he cites the Buckley v. City of New York case for that proposition. There's other court of appeals cases on this and similar issues. By way of analogy, when you have a negligent police hot pursuit case, a police chase case, what's going on? The police are chasing another vehicle. That other vehicle now hits an incident pedestrian. The city is liable for that negligence, even though they're not the one that actually hit the pedestrian because they violated the procedures. The court of appeals said that long ago in Selkowitz. That's still the law in the state of New York. They change it to recklessness instead of negligence, but the same concept that the municipality, through its employees, can be negligent. They fail to comply with good and accepted practices. That causes someone else to cause harm to the plaintiff, which is what happened here. My understanding of the special duty requirement is that it doesn't apply to a situation like the one where the city is sought to be held liable for wrongful infliction of the harm, but it rather applies to a situation where the city is sought to be held liable for the failure to come up after the initial infliction of the harm and do something to mitigate it. That's where EMT personnel show up to a person who has been injured and the EMT personnel behave wrongfully in failing to cure or help the problem. The theory of the special duty is that the city can't be everywhere protecting everybody from every kind of harm, and therefore the city's liability can only apply in circumstances where the city has a special duty to be there to help. Spot on. I agree with you 100%. There have been a couple of cases, McLean and Applewhite, that have kind of muddied it. Post-McLean cases have clarified that the special duty doesn't have an application to a case like this where the harm is caused directly by the city's liability. Exactly, and that's what the police case, the Court of Appeal, says as well. I agree 100%. If what the claim here was that the other officers should have stopped Miller from shooting, that would be a special duty case. That's not the claim here. The claim here is they caused Miller,  Spot on, Judge. But the other issue is whether ordinary negligence applies or whether, with respect to discretionary acts, the city and the police officers are somewhat protected by a rule that requires something more than negligence. It requires a violation of accepted procedures. Simply showing negligence that would apply in a non-municipal case isn't enough. You've got to show, for discretionary acts, you have to show either violation of the city's standards or violation of accepted standards of conduct. I half agree with you, Judge. Part of the showing of negligence, what makes them negligent? That they fail to comply with good and accepted practices and procedures. That's why they were negligent. For example, in the Rodriguez case, plaintiff's expert says you violated the standards. Defense expert says, no, we didn't. Jury, you sort it out. Here, the defendants, on my questioning, conceded what standards of care were, what practices and procedures were, and what did not happen here. To a degree, they recanted. When their lawyer questioned them, it's the same thing as if two witnesses contradicting one another, which is credibility for jury. The jury found 100% in our favor unanimously. The jury found that there was this violation of the procedures. They did not use any judgment at all. This was not even discretion. This was failure to perform ministerial duties that should have been performed. They were not performed. That is actionable negligence. Thank you. Thank you very much. Mr. Wallach reserved one minute for rebuttal. We'll hear from the city of Binghamton. May it please the court. My name is Brian Sokoloff, and I represent the city of Binghamton and Officer Miller. In this appeal, the plaintiff does not claim that the trial court, in its charge, gave the jury the wrong law. He's satisfied with the charge. He doesn't identify a single evidentiary ruling that was made during the trial that he had a problem with. The plaintiff got to call every single witness he wanted, got to call and put on any evidence that he wanted. There's just one thing he doesn't like, and that's the verdict. Well, no, he likes the verdict. The verdict was taken away by Judge McEvoy, wasn't it? He doesn't like the verdict against Officer Miller. I don't think he is even objecting to that. I think he's objecting to what Judge McEvoy did after the verdict came in. Well, then I'm thrilled. So then he acknowledges that the jury... First of all, he doesn't even challenge on this appeal at all. The jury's finding that Officer Miller did not violate 42 U.S.C. 1983. The plaintiff is arguing that the court erred in setting aside the verdict against the city. The plaintiff has not... I think it would do well to address that issue as to whether... Well, there are several aspects to it, but one of them is whether the plaintiff put before the jury sufficient evidence under the discretionary conduct rules of New York, sufficient evidence to show that the police, in their planning of and their execution of the break-in, violated accepted police procedure. Because I, to tell you where I stand, I would be prepared to affirm the court's setting aside of the ruling, but only on the theory that the plaintiff failed to put in sufficient evidence of violation of accepted police procedures. But counsel tells me that there's... Counsel has argued that there was plenty of evidence of that, and I want to know what you have to say. Well, I don't agree. There was no testimony that the use of a dynamic entry in a stack formation or a one-man battering ram violated any established standards of care. In contrast... What about the fact that the battering ram wasn't big enough to batter the door and they lost the element of surprise, which made, as Judge LaValle suggested earlier, Officer Miller more anxious about what he would find when he finally went through the door? That might be the case. We know the battering ram didn't work initially and they had to have a number of strikes. But there's no testimony and no evidence before the record that says that in that case, the accepted practice, the required practice, is to abandon and just stop the raid. In fact, I don't have the cite for you, but I recall that... Not to stop the raid, not to abandon it. One of the questions... The theory, the plaintiff's theory, had numerous aspects. But one of them was that, if I understand correctly, that the given reason for using the lighter rather than the heavier battering ram was the concern that the bigger one might not fit properly in the space, that they might find it impossible, difficult or impossible to use the bigger one in a confined space. And the plaintiff's theory was, one of the things was you should have done a reconnaissance to find out about the space to see whether it is true that the heavier one, which obviously would be better and better achieve surprise, would work, rather than just not bringing it, not having it there, and giving up the element of surprise. There was testimony in the trial, I can't cite you the page, that in the narrow space that the policemen were lined up in, there wasn't room... I'm not saying that somebody made that decision, but nonetheless, it wouldn't have fit in that space. And so now what does that mean? That means they can't execute a no-knock warrant? Perhaps. Perhaps that's what it means. Your Honour, there's another problem. The problem is that the plaintiff... There's no testimony that connects what he says after the fact they should have done. There's nothing that shows that the outcome here would have been any different. No testimony. The jury found Miller not negligent and not guilty of battery because they felt he was doing what the city required him to do, and yet they found the city negligent. So we have to assume that the jury drew the very inference that we're talking about, that Miller was led into this raid by an unprepared team without the proper resources, and that the negligence, the fault, lies somewhere other than with Miller. Your Honour, this was a respondeat superior verdict. I understand that. And that requires... ...dedicated on the theory that the four people, plus their supervisors, didn't prepare properly so that the door didn't get bashed down on the first effort. They lost the element of surprise. Miller was in an untenable situation of going into an armed camp, leading the way, and increasing the likelihood that he would shoot too soon. There was no testimony and no evidence in the case about who... I think you'd do well to address the instances in the record that counsel claimed. My thought was that you're right, there wasn't this evidence, but counsel pointed to a whole bunch of pages, and what do you have to say about that? Well, I don't have... I made a mistake and didn't bring the entire trial record with me, but my recollection is, as Your Honour's recollection... Did you try the case below? What's that? Did you try the case below? No, I did not. My recollection... I read the transcript. My recollection was these were all very open-ended questions. It would be a good idea to do this. It would be a good idea to do that. But that doesn't mean that there's some kind of a failure of a standard. Am I correct that the standard that the plaintiff would have had to meet was that it was a violation of accepted police practice? Yes. Merely negligence, merely saying it was negligence in a way that would work with a private employer. It would not work for a municipality. It has to go under the Discretionary Act rule. It has to go further. It has to be either a violation of established procedures of the city or of accepted police practice. Is that correct? I agree. So there was no testimony that what the police actually did here violated any standards of acceptable practice. There's no testimony or evidence that it was improper in this situation to use a one-man battering ram. There's no testimony or evidence that in this situation tasers, beanbag shotguns, chemical agents, that those are standard in a dynamic raid of this type. No testimony and no evidence that flash bangs, pole cameras, tactical mirrors, that these are required and always used and should be used on this kind of a raid. There's no testimony of that. Of course, after the fact, there was an unexpected situation. But that doesn't, I mean, that's a risk of a no-knock warrant. And there's no evidence. Put aside acceptable practice. Where is the connection in the evidence anywhere from anybody or on any document that says that if the police did what the plaintiff now after the fact says they should have done, that that would have changed the outcome? Well, I think that if Miller had had the element of surprise, which is what the no-knock warrant is designed to give the police, he might not have come in shooting. He would have had control of the situation. Counsel tells me it was beginning to be light. He walked in, he had his gun, and he saw someone. He would have taken an extra few seconds to assess this situation rather than thinking, my God, all these people were up, they heard me, they prepared for me, and they're prepared to shoot me. That's what he thought. But, Your Honor. If, as is very likely, if, as is very likely, the plaintiff was lying down when the police officers approached the door, if the first bang would have blown the door away and brought Miller ahead of the column into the room, the plaintiff, in all likelihood, would still have been lying down because there wouldn't have been even a second for him to get up from where he was earlier sleeping. But having to do two or three bangs, he was up if he was up. He was, in any event, by his own testimony, sitting up as opposed to lying down. The whole situation would have been different. And I think this is an inference that the jury was allowed to draw. Your Honor, there was testimony that, I want to make two points, please. There was testimony that if the police weren't able to breach the door with the first ram and it didn't work, if they abandoned their attempt to go in, that created a different threat. That could have put the police in jeopardy from the dangerous person they were given the no-knock authority to go get, number one. Number two, saying they should have brought a two-man battering ram, how does that change? We just told you. We just told you that they lost the element of surprise, which made Miller much more anxious once he walked into this room. And how were they supposed to know beforehand? That's what's called planning. That's what's called reconnaissance. That's what's called measuring the door. I'm not sure what kind of planning there would be. They say, well, go down to the building department and get the floor plans. Well, did they come into court and show the floor plans and say, well, the floor plans show it had this kind of a door that couldn't be breached? No. So what are they supposed to do? What kind of reconnaissance? Knock on the door, hello, we're planning on a surprise raid. What kind of door do you have? Did they even look at the house before they attempted this? They looked at the house. Before they attempted the no-knock warrant? They were outside. They looked at the house. They never did it in advance. They never, in advance of going on the night of the raid, they never looked at the house. This door, not just they didn't break it down, the door started to crumble, and it didn't give. They didn't make themselves obvious before the raid by trying to look at the front door to the living room of the person who they were about to raid. I'm not saying they go in full regalia, full uniform. Let's be adults here. They never did the kind of reconnaissance that I would want a police department to do if they were going to issue a no-knock warrant on any house to protect the police more than anything. I understand. After the fact, a lot of things might have changed. I'm talking about before the fact. No, I understand. I'm not talking about after the fact. Nobody has established what they reasonably could have known about this situation beforehand, reasonably could have known, that would have changed the outcome. Isn't it true that the person who was generally in charge of no-knock warrants was on vacation when they exercised this warrant? I know that the department head was away, but there were people that did this that did it many times before. These were experienced officers, many of them. Miller was put in the front because he was one of the most experienced officers. This is . . . An experienced officer who was, he said, very tense because they lost the element of surprise. He said . . . That's all. May I make a suggestion? I think it would be useful to be able to look very precisely at exactly what evidence was offered in support of the theory that what was done violated accepted police practice. And counsel gave me a bunch of page numbers when I was asking the question, but I think it would be useful to have the plaintiff give a letter within a few days specifying all the page numbers with a brief, maybe maximum a three-page letter explaining why this evidence supported a violation of accepted police practice and followed by a week later the city giving us a response as to pointing to your specific evidence . . . Or absence of it. Or the absence and with a brief letter as to why the plaintiff's evidence failed to create a triable issue of fact as to whether there was a violation of accepted police practice. I appreciate that opportunity. Does anybody disagree that that is the standard? The standard is . . . You both agree that the standard is whether the plaintiff's evidence showed violation of accepted police practice as opposed to just ordinarily conceived negligence. Well, I would go one step further and say that's required, but there also has to be evidence connecting, if there is a violation, connecting, reasonably connecting that dereliction to the injury. Well, that's the jury verdict. The jury verdict found Miller not negligent but found the city negligent. So, I mean, the city drew the inference that Miller acting under the aegis of the city rules shot the plaintiff because he wasn't properly protected by the police procedures. Well, I think what your point is, if in fact, after the fact, the space was in fact too small to use the larger battering ram, then the failure to bring the larger battering ram didn't cause the problem. Yes. That's what you mean. Yeah. Or whatever else. You know, if the plaintiff says, well, they should have used an under-the-door mirror, show that an under-the-door mirror would have revealed . . . it could have shown an officer outside without compromising the element of surprise that the plaintiff was where he was. They made that contention? They did at trial. They made the contention that they should have used an under-the-door mirror? Yeah. Okay. All right. Fine. Well, you will answer the plaintiff's . . . So, can we get within a week for the plaintiff and another week for the defendant? Yes. I appreciate that, and unless the Court has any questions, I thank you. Thank you. You have one . . . Your Honor, may I transfer my rebuttal time to Mr. Jennings? Sure. Thank you. But it's still only one minute. I'll talk fast. Right off the bat, Judge, first question, page 954. In order to ensure that police properly safeguard and protect the public and do not unnecessarily expose members of the public to unnecessary harm as well as themselves, police must obtain and use all available and reliable intelligence. True answer, yes. Next page, 955. I'm sorry? Police chief who said that? Police chief. Okay. Next page, 955, line 11. Properly performing your duties means ensuring that all members of the force receive all necessary intelligence to the best of your ability. Answer, to form that they're tasked with, yes. Okay? Did you argue to the jury finally that even if Miller wasn't negligent, the city was negligent in not doing this? Yes. And they were allowed to draw the inference that I discussed previously? Yes. And I would note that in response to what he's saying, they should not be faced with an unexpected situation. That is the whole point of planning. And here, in fact, testimony, page, you're supposed to have plans, 450. Contingency backup plans, 332 to 333. Different plans for different contingencies, 473. Should be sufficient personnel, 979. If you cannot do it safely, do not do it. 464, abort the mission, 468. No records of any meetings or briefing before the raid. No discussion of alternative or backup plans, 331 to 332. No intelligence. So there should not have been any unexpected, this is supposed to be professional police force. They're supposed to plan for including failure to breach the door, that's in the record as well. This should not have happened with proper planning. They did no planning whatsoever. And in fact, not only could they have gotten surveillance in the manners that you've suggested, there was in evidence photos showing a RE-MAX sign. Check the RE-MAX website, for God's sakes. You'll have a whole layout. They manufactured a trial, new claims. So the first time they claimed it was too tight for a two-man ram, that's on page 713. And they admit that they were not aware of the existence or size of the hallway or the door until after the botched entry, 713 to 714. They had no idea because they had no plans. They came in blind, which is why Miller was so afraid and shot the first thing he saw. So you're going to put this all in the form of a letter to us? Yes. One week today and then the city one week later. Thank you all. Can I just ask another question of both counsel, just to make sure to try and sweep aside things that might turn out to be irrelevancies. I want to know whether I have disagreement from either side. My perception is that the judge's given reasons for setting aside the verdict against the city were invalid. His first given reason was a failure to establish a special duty on the part of the city. Now, my perception is, as I think I went over this with plaintiff's counsel, but I don't think I did it with city's counsel. You don't contend, do you, that the special duty rule applies to a circumstance where the city's liability is predicated on the misconduct that causes the injury by the city's employees. In Lubecki, for example, there was a verdict against the city based on the misconduct of the city's employees. There was no special duty discussed. You don't disagree with that, do you? I disagree. You do? Yes. You think that if a police officer goes and shoots somebody in circumstances where there's absolutely no justification for doing so, if the police officer hears a loud bang and turns around and shoots somebody who's completely innocent, that there's no liability in the city unless there was a special duty owed by the city to the person who was shot? No, that's not what I'm saying. There would be liability in that situation under Battery, under 42 U.S.C. 1983. Police officer can commit an intentional crime. You're talking about state law. I'm talking about state law, too. And the state tort, the police officer in that situation would be liable for a Battery. What I'm talking about is police liability. The city. The city. The city would be liable. The city or the police officer, liability for negligence. This is a negligence claim. So you're saying in that circumstance, the absence of a special duty owed to the person who got shot would not prevent the city from being liable. There's no, the city doesn't have to have a special duty to somebody who gets wrongfully shot by a police officer to be liable. We're talking about different torts. So no, you don't, there doesn't have to be a special duty to find the police officer liable for Battery. But for the tort of negligence, which is where the special duty rule comes in, yes. The police, whether the police officer caused the harm or not, there still has to be a special duty. Because negligence is breach of a duty. Well, we have to look to see what the duty was. The duty of performance by the police in accordance with accepted police standards. If the police shoot somebody in violation of accepted police standards. The Court of Appeals in the Valdez case separated two different concepts. One is special duty and the other is a defense where there's discretion involved. Let me put it more particularly. If the plaintiff's evidence, if in a hypothetical case, not this one, a hypothetical case, the plaintiff established that in performing one of these no-knock raids, the police department violated accepted police standards. And the result of their doing so was that somebody got shot who wouldn't have gotten shot if they had done it the proper way in accordance with accepted police standards. Does the absence of a special duty to that person bar liability on the part of the officers? You do argue that. And you're relying principally on Applewhite? Yes. But there haven't been any cases since the Court of Appeals decision in Applewhite that apply. I agree with you that it broadens the circumstances in which the special duty rule applies. But I haven't found any cases decided by a state court that applied in the context of a police shooting of this sort. Have you? I haven't, but can I tell you why I don't think there are that many cases on this? And that's something that we argued. It was our point one in the brief. You can't have a claim for negligence arising out of conduct that was intentional. This was not an accident. The officer testified that he intended to shoot the plaintiff. He didn't accidentally fire his gun. He didn't hold his gun the wrong way. You're talking about Miller, but I'm talking not about Miller's shooting. I'm talking about the plaintiff's assertion that the team failed to prepare adequately, failed to use the right equipment, created a dangerous situation, which resulted in Miller's shooting the plaintiff. I understand that's the argument, but again, I don't see any exception. Well, assuming that their evidence sustains that, does the absence of a special duty to Ferreira mean that the city's not liable and the officers aren't liable? Yes. Okay. That's your position. Could you also address the city's position as to the governmental immunity ground? In three pages? Yeah. Well, you can do it in three sentences here. I think my colleague was asking whether you also agree that this was an improper basis for decision by the district court. No. I believe that . . . You're asking about the discretionary immunity? Yeah. I believe that there is discretionary immunity where there is no showing that the police violated acceptable standards, what their standards are. Right. But if they did, then there is no discretionary immunity. There is no immunity when there's a violation of acceptable standards. Right. Okay. So we're all in agreement. Cases seem to say that, yes. In other words, it's a slightly different concept of what causes liability. It's not negligence that causes liability. It's violation of accepted standards. Negligence wouldn't necessarily do it unless it was negligence that violated accepted police standards. But I would say that the standards have to be specific standards, not generally. Somebody could come in and say, well, it's a good idea to make sure that nobody gets injured. And while somebody got injured, that means there's a violation of a standard. That's not what I'm talking about. I'm talking about a patrol guide, internal regulations. You're supposed to do this this way, not do this that way. That's what I'm talking about. All right. I think that's a good way to end it. Thank you all very much. Thank you all very much. We'll reserve decision. We'll look forward to your submissions. Thank you.